UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CRIMINAL ACTION NO. 17-34-DLB-CJS

UNITED STATES OF AMERICA                                              PLAINTIFF

v.               **REPORT AND RECOMMENDATION**

RICHARD R. CRAWFORD                                                   DEFENDANT

\* \* \*   \* \* \*   \* \* \*   \* \* \*

This matter is before the Court on the second Motion to Suppress of Defendant Richard R. Crawford ("Crawford"), filed on March 22, 2018, wherein Crawford seeks to suppress incriminating statements made to law enforcement officers during the June 29, 2017 execution of a search warrant. (R. 28). The Government filed its Response on March 28, 2018 (R. 29), and Defendant filed a Reply on April 2, 2018, requesting an evidentiary hearing based upon the factual assertions of the United States (R. 31). The Court held an evidentiary hearing on the subject Motion on April 19, 2018. Upon completion of the parties' presentation of evidence, counsel indicated that the parties did not wish to submit any further briefing and the matter was taken under submission. Defendant's second Motion to Suppress is now ripe for review by the undersigned for preparation of a Report and Recommendation[1] pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* R. 3). Based upon the Court's review of the record as well as the testimony and evidence presented at the April 19, 2018 evidentiary hearing, and for the reasons set forth below, it will be recommended that Defendant's second Motion to Suppress (R. 28) be **denied**.

---

[1] *See United States v. Quinney*, 238 F. App'x 150 (6th Cir. 2007) (citing *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001) (characterizing a motion to suppress as dispositive)).

I.     **BACKGROUND AND EVIDENTIARY HEARING**

On June 29, 2017, a warrant was issued by the Circuit Court of Boone County, Kentucky, based upon the affidavit of Agent Chris Boyd following a joint investigation by the Northern Kentucky Drug Strike Force and Hamilton County Sheriff's Department Regional Narcotics Unit. (*See* R. 19-1; R. 19-4; R. 28). Agent Boyd's affidavit recounted the investigation that led the task force officers to conclude there was probable cause to believe Crawford's vehicle, as well as the apartment of Crawford's wife in Florence, Kentucky, where Defendant was staying, were being utilized to facilitate the trafficking of controlled substances. (*See* R. 19-4; R. 21, at 2-4). The warrant authorized the multi-jurisdictional drug task force team to search Defendant Crawford's vehicle and apartment. (*See* R. 19; R. 21; R. 28).

During the execution of the warrant on June 29, 2017, Defendant Crawford made incriminating statements when he was detained in a police cruiser and questioned by two agents. (*See* R. 28). A federal Indictment followed on September 14, 2017. (R. 1). Defendant stands charged with knowingly and intentionally distributing and possessing with the intent to distribute cocaine, as well as knowingly and intentionally possessing with intent to distribute 28 grams or more of a mixture or substance containing cocaine base, all in violation of 21 U.S.C. § 841. (*Id.*).

Defendant Crawford filed his first Motion to Suppress on November 9, 2017, and a Supplemental Motion to Suppress on November 28, 2017. (R. 14; R. 18). Defendant Crawford's Motion sought to suppress "all evidence obtained as a result of" the search warrants issued in the investigation, as well as any statement made by Crawford. (R. 14; R. 18). Defendant's Motion argued that there was no probable cause to issue a search warrant because the affidavits in support were primarily based upon information provided by a confidential informant working with drug task force agents in this case. (*See* R. 18, at 3). Following briefing from the parties, the

undersigned entered a Report and Recommendation (R. 21) recommending that the presiding District Judge deny Defendant's Motion to Suppress finding that, *inter alia*, the search warrants at issue were supported by probable cause. (*See* R. 21). Defendant filed Objections to the Report and Recommendation on February 22, 2018 (R. 22), and the matter has been submitted to the presiding District Judge for adjudication.

On March 1, 2018, Crawford filed a Motion for Enlargement of Time to file a second suppression motion, as defense counsel discovered that he had not reviewed a portion of the audiovisual recording made by a body camera that was left in the police cruiser where Defendant was detained during the subject June 29, 2017 search warrant execution ("cruiser camera recording"). (R. 24). Crawford filed that second Motion to Suppress on March 22, 2018, and therein seeks to suppress incriminating statements made to law enforcement officers during the June 29, 2017 execution of the search warrant and reflected on the cruiser camera recording. (R. 28). Defendant asserts that suppression of the statements he made while detained in the police cruiser is warranted because he was subjected to custodial interrogation without first receiving any *Miranda* warning. (*See id.*). In its Response, the Government argues that Defendant received an appropriate *Miranda* warning before the cruiser camera began recording and chose to voluntarily waive his rights by talking with the agents. (R. 29). Crawford's Reply requested an evidentiary hearing based upon the factual assertions of the United States, to determine the time and manner in which the *Miranda* warning was allegedly delivered to Defendant. (R. 31).

On April 19, 2018, the Court held an evidentiary hearing on the subject Motion, and heard evidence regarding whether Defendant Crawford was given a *Miranda* warning prior to being questioned by the law enforcement agents during the June 29, 2017 execution of the search warrant. (*See* R. 34). Crawford appeared with counsel, David Fessler, and the United States was

3

represented by Assistant United States Attorney Anthony Bracke. (*Id.*). At the hearing, the United States called Retired Sergeant Pete Wilson, along with Agent Erik Nelson, a narcotics investigator with the Regional Narcotics Unit, and Agent Chris Boyd, an investigator with the Northern Kentucky Drug Strike force, to testify regarding the circumstances of Crawford's custodial interrogation. These witnesses were cross-examined by defense counsel. Defendant then indicated that he wished to testify,[2] and offered testimony in support of his suppression motion before being cross-examined by the United States. The parties also jointly submitted a DVD of the cruiser camera recording. (*See* Joint Exhibit 1).

At the evidentiary hearing, Retired Sergeant Pete Wilson testified that on the day of the warrant execution, he was a supervisor with the Northern Kentucky Drug Strike Force tasked with pre-surveillance of the apartment and supervision of the arrest team. (R. 36, at 8). At approximately 2:18 p.m., Sergeant Wilson observed Defendant Crawford come down the stairs from the subject apartment and then walk toward his vehicle. (*Id.* at 8-9). Sergeant Wilson walked over to Crawford and identified himself as a law enforcement officer. (*Id.* at 9, 51-52). Sergeant Wilson walked Crawford over to a Boone County sheriff's cruiser. (*Id.* at 9, 52). The Boone County cruiser was present to help secure the scene if necessary and also to furnish a secured vehicle in which to place suspects as the task force agents' covert vehicles did not have cages or other security features. (*Id.* at 12). With the assistance of two other officers—Agent Mike Roland and Agent Jacob Piper—Crawford was placed in handcuffs and his pockets were emptied. (*Id.* at 13-14, 52). Agents Roland and Piper took the keys from Defendant's pocket and coordinated with

---

[2] The Court granted defense counsel's oral motion for a brief recess to discuss the issue of testifying with Defendant Crawford. (*See* R. 36, at 48-49). The Court also cautioned Defendant that he was under oath, subject to a separate prosecution for perjury should he testify falsely, and subject to cross-examination. (*Id.* at 47).

the law enforcement team to use the keys to execute the search warrant without tearing up the apartment door. (*Id.* at 31-32, 52).

Sergeant Wilson took a card from his badge case and read the *Miranda* warning to Crawford from the card. (R. 36, at 9-10; *see also* Government's Exhibit 1). Sergeant Wilson testified that Crawford was cognizant of what Wilson said to him and verbally responded that he understood his rights. (*See* R. 36, at 9-13). Wilson indicated Crawford continued to ask what was going on, but as it was not Wilson's role to conduct the questioning, Wilson placed Crawford, handcuffed, in the back seat of the cruiser at approximately 2:23 p.m. and said that someone would be with him in a few minutes. (*Id.* at 9-10, 18-19).

Agent Erik Nelson and Agent Chris Boyd also testified at the evidentiary hearing. During the relevant time period, Agent Nelson was assigned to the Hamilton County Sheriff's Department Regional Narcotics Unit ("RENU"), and Agent Boyd was assigned to the Northern Kentucky Drug Strike Force as a narcotic agent. (*See* R. 36, at 16-18, 29). On the date of the subject warrant execution, the two agents took up a surveillance position at the apartment complex in a plain clothes vehicle and observed Defendant being taken into custody from a vantage point approximately 75 yards away. (*Id.* at 18, 31). After Agents Piper and Roland took Crawford's keys, Agent Boyd coordinated getting the keys to execute the search warrant without tearing up the apartment door. (*Id.* at 31-32, 52).

Agents Nelson and Boyd then approached the Defendant where he was handcuffed in the back of the marked cruiser. (R. 36, at 19, 22, 32). Agent Boyd introduced himself and Agent Nelson, and explained to Defendant Crawford that they were there with a search warrant to locate cocaine. (*Id.* at 32-35, 44). Agent Boyd pulled out his cellular phone and accessed an application that contains the *Miranda* warning. (*Id.* at 19, 21, 32). Agent Boyd then read from the application

5

and Mirandized Defendant Crawford. (R. 36, at 32-33; *see also* Government's Exhibit 2). Agent Boyd testified that he asked Defendant if he understood his rights, and Defendant said yes. (R. 36, at 19-20, 34).

Agent Boyd testified that nothing about his encounter with the Defendant indicated that Crawford did not understand what Agent Boyd was saying to him. (R. 36, at 34-37). Agents Nelson and Boyd testified that, when Agent Boyd then asked Defendant if he wanted to talk, Crawford responded affirmatively and stated that he wanted to know "what's going on." (R. 36, at 20-21, 34). Mr. Crawford continued to talk after that point in time in response to the agents' questions. (*Id.* at 20). Defendant told the agents, *inter alia*, that the cocaine they located during their search had been left over following law enforcement's execution of a search warrant at his old residence in 2009; Defendant told the agents that he had found the old cocaine in storage and placed it under the sink, where it was found by law enforcement during execution of the subject search warrant. (R. 36, at 35-36, 64-67).

The agents testified that Boone County Deputy Canfield entered the cruiser during the Agents' interrogation of Defendant, positioned a body camera in the cruiser, and began recording approximately 5-10 minutes after the agents began speaking with Crawford. (*Id.* at 23-24, 30, 34-37). Agent Boyd testified that the body camera was not recording prior to that time. (*Id.* at 32). Agent Boyd further testified that Defendant can be heard as the recording begins responding to the agents' questions and telling them about the old cocaine he had found in storage and placed under the sink. (*See* R. 36, at 35-36; *see also* Joint Exhibit 1, at 13:55:25[3]). Following their interrogation of Defendant Crawford, the agents testified that they went upstairs and assisted in executing the

---

[3] Agent Nelson and Agent Boyd testified that the time stamp on the cruiser camera recording is not accurate. (R. 36, at 24, 30).

search warrant in the apartment, leaving Defendant Crawford in the custody of Boone County Deputy Canfield. (R. 36, at 22-23).

Defendant's testimony largely matched the agents' account of the event; however, Defendant testified during his direct testimony that he did not recall Sergeant Wilson or Agent Boyd reading his *Miranda* rights to him. (*Id.* at 54). On cross-examination, counsel for the United States asked Defendant whether his statement that he could not recall the law enforcement officers informing him of his rights was the same thing as stating that they did not do so. (*Id.* at 61). Defendant responded that "[i]t did not happen." (*Id.*). Defendant also testified that Deputy Canfield was sitting in the car recording the entire time the agents questioned him. (R. 36, at 55). Defendant testified that statements made to him by Officer Canfield inside the police cruiser caused him confusion as to whether he was being detained or under arrest, stating that "[i]t was more like an informational type of situation more than it was a situation where they were trying to protect me with a *Miranda* warning or they were letting me know what was going on or anything like that. It wasn't like that." (R. 36, at 57).

The cruiser camera recording accords with the agents' testimony. Defendant's voice is audible as the cruiser camera recording begins; Defendant is responding to an ongoing interrogation by two male voices regarding the search of the apartment. (*See* Joint Exhibit 1, at 13:55:25). The two voices are less audible than Defendants, indicating that they are speaking to Defendant from outside the vehicle. The camera is positioned facing the roof of the cruiser, and only a small portion of the front passenger side headrest and driver's side seat is visible in the frame. A door of the cruiser is shut while the interrogation continues, and the driver's side of the vehicle darkens, indicating that an occupant has exited the vehicle. (*Id.* at 13:55:32). Defendant can be heard stating that the cocaine found in the search was old. (*Id.*).

7

The interrogation ends, the two interrogating voices retreat, and a cruiser door audibly closes. (*Id.* at 13:59:24). Defendant curses to himself. (*Id.* at 13:59:38). A cruiser door then can be heard opening and the driver's side ceiling brightens, indicating that the driver's side door has been opened. (*Id.* at 13:59:53). A portion of a man's head can be seen near the driver's side headrest, and an arm reaches to reposition the camera. (*Id.* at 13:59:56). The man seated in the driver's side seat begins speaking with Defendant, and from the statements attributed to him by the witnesses it is apparent that this individual is Deputy Canfield. (*See id.*).

Defendant asks Deputy Canfield how the police have probable cause to search the apartment when it is his wife's residence, not his. (*Id.* at 14:00:00). Deputy Canfield responds that "they must have something" and continues that: "I don't know anything. I'm just a patrol deputy that was here to make you all know these guys coming around were policemen. That's it. That's why I stay over here. I don't know what they're saying to you, I don't know what you're saying to them." (*Id.* at 14:01:07). Defendant continues to ask Deputy Canfield hypothetical questions about probable cause, and Deputy Canfield responds that he does not know the case. (*Id.* at 14:09:24). He states to Defendant, "I can't ask you specific questions, because I don't know if they have you under arrest or not, you've been Mirandized; I have no idea." (*Id.* at 14:20:35). Defendant interjects with a tone of certainty, "Oh, I'm under arrest." (*Id.* at 14:20:46). Deputy Canfield continues that "I'm not going to ask you any questions pertaining to the case to try to get a feel for it, because I'm not trying to violate your rights or anything of that nature." (*Id.* at 14:20:48).

The agents testified that Deputy Canfield was not present at the scene for investigative purposes; rather, Canfield was there to serve as perimeter security for people who may approach the scene. (R. 36, at 30-31, 45-46). Agent Boyd testified that, as a result, Deputy Canfield was

8

"in and out of his cruiser" during the relevant time period. (*Id.* at 37). Likewise, as most of the law enforcement team members were in plain clothes, Canfield also served as a uniform officer presence with a marked police cruiser, to let other individuals present at the apartment complex know it was a police operation. (*Id.* at 41). Deputy Canfield's role at the scene was also to "baby-sit" Crawford while the agents were conducting their search, as well as to provide prisoner transport; the deputy's cruiser was a secured vehicle, while the agents' covert vehicles did not have cages or other security features. (*Id.* at 12, 23, 30-31, 45-46).

Further, Agent Boyd testified that Deputy Canfield was not part of the investigation and had no idea what was going on. (R. 36, at 30-31). Because Canfield's role was to serve as perimeter security, his focus was on the perimeter and not what was going on in the cruiser. (*Id.* at 45-46). Agent Nelson likewise testified that Deputy Canfield was not debriefed before Crawford was placed in the cruiser. (*Id.* at 23). Agent Nelson testified that in narcotics investigations, a lot of times patrol officers are used to watch suspects that are under arrest, and because the patrol officers are just there for security reasons they do not know all the specifics on what is occurring. (*Id.* at 27).

Upon conclusion of the evidence at the evidentiary hearing, counsel for both parties indicated that they did not wish to engage in argument or further briefing. (*Id.* at 72-73). Accordingly, the Court placed Defendant's subject second Motion to Suppress (R. 28) under submission for issuance of a Report and Recommendation.

## II.    ANALYSIS

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the U.S. Supreme Court held that this privilege against self-incrimination applies to a

9

criminal suspect subjected to custodial interrogation. Specifically, statements taken during a custodial interrogation cannot be admitted to establish guilt unless the accused was provided a full and effective warning of his rights at the outset of the interrogation process and knowingly, voluntarily and intelligently waived his rights. *Id.* Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. *Miranda* applies, therefore, if the suspect was (1) interrogated while (2) in custody. *See, e.g., Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).

The record reflects—and the parties do not dispute—that Defendant Crawford was subjected to custodial interrogation during the execution of the search warrant on June 29, 2017. First, even when a formal arrest has not occurred, a suspect may be in sufficient custody to invoke *Miranda* when his or her freedom of movement is restrained to "the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (citing *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)); *see also United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998). It is undisputed that Defendant Crawford was sufficiently "in custody" on June 29, 2017. (*See* R. 29, at 2; *see also* R. 36, at 7). Defendant was handcuffed and placed in the back of a police cruiser while the law enforcement team began executing the search warrant, where he was not allowed to make a phone call to his wife or to exit the vehicle to speak with her. (*See* R. 28; *see also generally* Joint Exhibit 1). This restriction in Defendant's freedom of movement equated to the degree associated with a formal arrest and would lead a reasonable person to believe he was not at liberty to leave.

Likewise, a suspect is subject to interrogation when statements made by law enforcement officers are of the sort that police should know are reasonably likely to evoke an incriminating

10

response. *Innis*, 446 UY.S. at 301-02 (stating that Interrogation under *Miranda* is "express questioning or its functional equivalent" that law enforcement officers "should know [is] reasonably likely to elicit an incriminating response."). It is undisputed that Defendant was interrogated by the task force agents, and the cruiser camera footage reflects questions from the Agents to Defendant regarding the location of narcotics in his possession. (*See also* R. 29, at 3). Law enforcement officers should know that substantive questions regarding Crawford's suspected criminal activity are reasonably likely to evoke an incriminating response. Accordingly, Defendant's incriminating statements cannot be admissible absent a showing by the United States, by a preponderance of the evidence, that the law enforcement team provided a full and effective warning of his rights at the outset of the interrogation process, and Defendant Crawford knowingly, voluntarily and intelligently waived his rights. *See Berghuis v. Thompkins*, 560 U.S. 370, 388 (2010).

    **A.**    **The United States has shown by a preponderance of the evidence that the law enforcement team provided a full and effective warning of Defendant's rights at the outset of the interrogation process.**

The evidence indicates that the task force agents read Crawford his *Miranda* rights and provided a full and effective warning prior to Crawford's statements to the officers. A *Miranda* warning "must reasonably convey to a suspect his rights under *Miranda*, though no 'precise formulation' or 'talismanic incantation' is required." *United States v. Hopson*, 134 F. App'x 781, 786 (6th Cir. 2004) (citing *Duckworth v. Egan*, 492 U.S. 195, 202-03 (1989)). "The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." *United States v. Tillman*, 963 F.2d 137, 141 (6th Cir. 1992) (internal citations omitted); *see also Treesh v. Bagley*, 612 F.3d 424, 433 (6th Cir. 2010) (full *Miranda* warning given at arrest, with partial re-warnings before questioning, sufficiently apprised defendant of rights).

11

Here, Defendant Crawford received two full and complete *Miranda* warnings over the course of a few minutes. Sergeant Wilson testified that when he approached Crawford, Wilson identified himself as a law enforcement officer, displayed his badge, and placed Crawford in handcuffs. (R. 36, at 9). After Sergeant Wilson escorted Crawford to the marked Boone County Sheriff's cruiser, he proceeded to read Crawford the *Miranda* warning straight from a printed card. (*Id.* at 9-10). After reading Crawford his *Miranda* rights, Wilson then placed Crawford in the back of the sheriff's cruiser. (*Id.* at 13). During this time, Agents Eric Nelson and Chris Boyd were approaching the cruiser by foot from their surveillance post approximately seventy-five meters away. (*Id.* at 18). After arriving at the cruiser and finding Crawford handcuffed in the back seat, Agent Boyd then produced his cellular phone and recited the *Miranda* warnings directly from an application on the phone. (*Id.* at 32).

Defendant's testimony that Agent Boyd and Sergeant Wilson did not read the *Miranda* warnings from the cellular phone and card, respectively, does not comport with the record and fails to mitigate the Government's showing by a preponderance of the evidence. In support of Defendant's position, he relies heavily on the fact that the cruiser camera recording did not record the *Miranda* warnings being given. (R. 28, at 2-4). However, it is evident that the recording begins in the midst of an ongoing interrogation. (*See* Joint Exhibit 1, at 13:55:25). Both Sergeant Wilson and Agent Boyd testified that they advised Defendant of his rights prior to the time Deputy Canfield began recording with the body camera left in the cruiser. The officers' statements are persuasive and comport with the record.

Moreover, while Defendant points to Deputy Canfield's statement on the recording that he did not know whether Defendant had received a *Miranda* warning and did not know if Defendant was under arrest (*see* R. 28), Defendant's Motion mischaracterizes these statements by taking them

12

out of context. The evidence shows that Deputy Canfield was not a participant in the interrogation. Agent Boyd testified that Canfield was in and out of the cruiser during the search; role was to serve as perimeter security, and his focus therefore was on the perimeter and not what was going on in the cruiser. (R. 36, at 45-46). Defendant himself acknowledged that his arrest drew attention from the residents of the apartment complex. (R. 36, at 53). The cruiser camera recording shows Deputy Canfield reentering the vehicle after the agents finished the interrogation. (*See* Joint Exhibit 1, at 13:59:24). Deputy Canfield expressly stated to Defendant not only that he was not involved in the investigation, but that he stayed away during the interrogation and did not hear what was said: "I'm just a patrol deputy that was here to make you all know these guys coming around were policemen. That's it. *That's why I stay over here. I don't know what they're saying to you, I don't know what you're saying to them.*" (*Id.* at 14:01:07) (emphasis added). Taken in context, Deputy Canfield's statements do not undercut the agent's full recitation of the *Miranda* warning which Defendant stated to the agents that he understood. This is supported by Defendant's own affirmative statement in response to Deputy Canfield's uncertainty that Crawford was, in fact, under arrest. In sum, the evidence indicates that the task force agents read Crawford his *Miranda* rights and provided a full and effective warning prior to Crawford's statements. Accordingly, Defendant Crawford's second Motion to Suppress (R. 28) should be denied.

      **B.**    **The United States has shown by a preponderance of the evidence that Defendant gave a voluntary and knowing waiver of his Miranda rights.**

Crawford voluntarily, knowingly, and intelligently waived his right to remain silent during his interrogation with the agents. The burden rests with the United States to establish, by a preponderance of the evidence, that a defendant has waived his *Miranda* rights. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). To establish a waiver, two distinct inquiries must be made. *Thompkins*, 560 U.S. at 382; *United States v. Crumpton*, 824 F.3d 593, 606 (6th Cir. 2016). First,

13

the waiver must have been voluntarily given. *Id.* Second, the defendant's waiver must have been knowingly and intelligently given. *Id.* In each instance, a specific factual inquiry must be made to determine if, under the totality of the circumstances, the defendant has waived his rights. *United States v. Adams*, 583 F.3d 457, 467 (6th Cir. 2009).

The evidence presented indicates that the waiver was voluntary rather than the product of improper police action. To be voluntarily given, the waiver must have been "the product of deliberate choice rather than intimidation, coercion or deception." *Adams*, 583 F.3d at 467 (citing *Machacek v. Hofbauer*, 213 F.3d 947, 954 (6th Cir. 2000)). Defendant makes no allegations of intimidation, coercion or deception in his Motion to Suppress or in his testimony at the evidentiary hearing; rather, his argument primarily concerns establishing that Crawford was in a custodial setting and that he was subjected to interrogation. (*See* R. 28).

Defendant's subject Motion to Suppress points out that there is no written waiver. However, "[a]n express written or oral statement of waiver is not required." *Treesh v. Bagley*, 612 F.3d 424, 433 (6th Cir. 2010) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). *See also United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002) (stating that, to find a waiver of a defendant's *Miranda* rights, the courts do not require a physical document signed by the defendant). Rather, having received a *Miranda* warning, a defendant may be implied to have waived his right by subsequently responding to questioning by law enforcement. *United States v. Adams*, 583 F.3d 457, 467-68 (6th Cir. 2009); *see also United States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008) (stating that when a defendant is fully informed of his rights and proceeds to answer questions, this is "as clear an indicia of his implied waiver of his right to remain silent as we can imagine.")

Implied waiver is sufficient when the defendant has "evinced a willingness and a desire for a generalized discussion about the investigation." *See Davie v. Mitchell*, 547 F.3d 297, 304 (6th Cir. 2008) (citing *Oregon v. Bradshaw*, 462 U.S. 1039 (1983)). *See also United States v. Whaley*, 13 F.3d 963 (6th Cir. 1994) (stating that generally waiver occurs "when, without influence by the authorities, the suspect shows a willingness and a desire to talk generally about his case."). In *Bradshaw*, a plurality of the Supreme Court concluded that authorities could speak to a defendant, without depriving him of his rights, when the defendant asked "Well, what is going to happen to me now?" even though the defendant had previously invoked his right to counsel. *Bradshaw*, 462 U.S. at 1041-42. The plurality concluded that in asking this question the defendant had sufficiently evinced a willingness for generalized discussion about the investigation. *Id.* at 1045-46.

Here, like the defendant in *Bradshaw*, Crawford expressly evinced a willingness to discuss the investigation without influence by authorities. Officer Wilson, Agent Boyd, and Agent Nelson testified that immediately after informing Defendant of his *Miranda* rights, Defendant indicated that he was willing to talk and asked what was going on. Likewise, the cruiser camera recording shows that Deputy Canfield did not serve an investigative role and passively responded to Crawford's initiation of conversation. Indeed, without any police influence, Crawford repeatedly questioned Deputy Canfield regarding the probable cause basis for the search warrant despite Deputy Canfield's statement to Crawford that he did not know the facts of Crawford's case and that he was "just a patrol deputy that was here to make you all know these guys coming around were policemen." (Joint Exhibit 1, at 14:01:07). There is no evidence in the record that Crawford's statements were the product of improper influence on the part of the police. Nothing in the record indicates any type of "coercive police activity" that would create a question of whether Defendant's "will was overborne by the circumstances surrounding the giving of a confession."

15

*Dickerson*, 530 U.S. at 434; *Connelly*, 479 U.S. at 167.  To the contrary, Crawford's questioning of both the agents and Deputy Canfield evinced a willingness to talk about the subject matter of the investigation, thereby satisfying the first requirement of *Bradshaw*.

Crawford's waiver was not only voluntary, but also knowingly and intelligently given.  The totality of the circumstances indicates that Crawford knowingly and intelligently waived his rights to counsel and silence.  A statement is knowingly and intelligently given when "the suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time."  *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (citing *Colorado v. Spring*, 479 U.S. 564, 547 (1987)).  This determination depends upon "the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused."  *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).  The totality of the circumstances can include such factors as "age, education, and intelligence of the defendant; whether the defendant has been informed of his *Miranda* rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as deprivation of food or sleep."  *Murphy v. Ohio*, 551 F.3d 485, 511 (6th Cir. 2009); *see also United States v. Montgomery*, 621 F.3d 568, 573 (6th Cir. 2010) (examining factors such as the suspect's age, experience, education, background, and intelligence); *Jackson v. McKee*, 525 F.3d 430, 434 (6th Cir. 2008) (weighing such factors as the defendant's familiarity with the criminal justice system from prior convictions, whether the defendant appeared to be lucid and sober, whether the defendant asked for an attorney, and whether the defendant was able to point to any verbal or physical threats by law enforcement officers to compel the incriminating statements).

Under the totality of the circumstances, Crawford's conduct and the relevant factors point to a knowing and intelligent waiver such that he understood his *Miranda* rights and the

consequences of waiving those rights. A defendant's prior experience with the criminal justice system is a consideration in determining whether his waiver was knowing and intelligent. *See Murphy*, 551 F.3d at 514 (citing *Smith v. Mullin*, 379 F.3d 919, 933 (10th Cir. 2004)). At the time of the warrant execution, Crawford was a middle-aged adult who had extensive experience with the criminal justice system. Defendant stated on multiple occasions that he had been arrested before, and had recently been released from an 8-year term of incarceration. (*See generally* Joint Exhibit 1; R. 36, at 57, 59-61). He questioned Deputy Canfield extensively and cogently regarding the sufficiency of probable cause to search his wife's apartment in light of the evidence he believed the agents had gathered. (*See, e.g.,* Joint Exhibit 1, at 14:00:00). Additionally, Crawford had received *Miranda* warnings not only from Sergeant Wilson, but again from Agent Boyd, within a few minutes of one another. Each time the officers asked Defendant if he understood and was willing to talk, and each time Crawford responded unequivocally that he was willing to speak and began asking questions. (R. 36, at 20-21, 34). Based upon his admitted familiarity with the criminal justice system, his acknowledgement to Deputy Canfield that he was under arrest, and his cogent, lucid statements regarding the sufficiency of the officers' probable cause to search his wife's apartment, the factors indicate that Crawford's decision to make statements to the law enforcement officers was knowing and intelligent.

Furthermore, neither Sergeant Wilson nor the agents observed behavior to show that Crawford did not appreciate or understand the *Miranda* warnings read to him. Sergeant Wilson testified that he did not feel that Crawford's responses were out of the ordinary or otherwise incongruent with a person who understood his rights. (R. 36, at 10-11, 13). Likewise, Agent Nelson testified that he did not observe any behavior from Crawford that indicated he did not understand the warnings that were given to him, and Agent Boyd testified that he did not observe

17

any behavior from Crawford that indicated anything but an understanding of the rights as Boyd read them to him. (*Id.* at 19-20, 34, 36-37). Crawford appeared to be lucid and sober, had familiarity with the criminal justice system from prior convictions, did not ask for an attorney, and did not point to any verbal or physical threats by the law enforcement officers to compel incriminating statements. *See Jackson*, 525 F.3d at 434. At no point in time did Crawford make any indication that he desired the questioning to stop; indeed, when Deputy Canfield cautioned Defendant that he did not know whether Defendant was under arrest and did not want to violate Defendant's rights by asking questions, Defendant ignored Deputy Canfield's statement and continued to ask Canfield questions.

Moreover, the record shows no evidence that the law enforcement officers used physical punishment to elicit the statements at issue, that the duration of the questioning was unduly prolonged or repeated, or that the law enforcement officers used threats or physical punishment, such as deprivation of food or sleep. To the contrary, the cruiser camera recording indicates that the questioning was short in duration, that Crawford was detained for less than a few hours, and that the law enforcement officers were courteous to Crawford. The police questioning was fairly gentle, and the interviews were relatively brief. Moreover, Deputy Canfield can be observed ensuring that Crawford can feel the cruiser's air conditioning, and acquiescing to Crawford's request to take his watch to his wife. (R. 36, at 63). Crawford testified that Deputy Canfield responded to Crawford's complaint that his handcuffs were too tight and attempted to make it more comfortable for Crawford. (*Id.*).

Defendant testified that the incongruous statements made by Deputy Canfield regarding Defendant's status—which were qualified by Canfield's statement that he did not know anything, was not a part of the investigation, and was merely a patrol officer there for security purposes—

18

caused Defendant confusion. The Court's review of the cruiser camera recording, however, does not support Defendant's testimony. When Deputy Canfield stated to Crawford that "I can't ask you specific questions, because I don't know if they have you under arrest or not, you've been Mirandized; I have no idea," Defendant responded with certainty, "Oh, I'm under arrest." (*Id.* at 14:20:35). While in a vacuum Canfield's statement may have been confusing or incongruous with the agents' statements, Defendant's emphatic statement that he was under arrest indicates that Crawford himself was certain. Under the totality of the circumstances, the United States has shown by a preponderance of the evidence that Crawford's statements were knowingly and intelligently given, and nothing in the record demonstrates a violation of Defendant's constitutional rights. Accordingly, because Crawford voluntarily, knowingly, and intelligently waived his rights, the confession is admissible, and Crawford's second Motion to Suppress (R. 28) should be denied.

### III. CONCLUSION AND RECOMMENDATION

The evidence and testimony presented at the evidentiary hearing, as well as the evidence set forth in the record, demonstrate that Defendant Crawford's constitutional rights were not violated. Accordingly, for the reasons stated herein, **IT IS RECOMMENDED** that Defendant's Motion to Suppress (R. 28) be **denied**.

Specific objections to this Report and Recommendation must be filed within fourteen (14) days of the date of service or further appeal is waived. 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P. 59(b)(2); *Thomas v. Arn*, 728 F.2d 813, 815 (6th Cir. 1984), *aff'd*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Dated this 18th day of May, 2018.



Signed By:
Candace J. Smith
United States Magistrate Judge

J:\DATA\Orders\criminal cov\2017\17-34 Crawford 2d MTSuppress R&R.final.docx