**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CRIMINAL ACTION NO. 17-34-DLB-CJS**

**UNITED STATES OF AMERICA**                                                                    **PLAINTIFF**

**V.**                        <u>**ORDER ADOPTING REPORT AND RECOMMENDATION**</u>

**RICHARD R. CRAWFORD**                                                                    **DEFENDANT**

\* \*  \* \*  \* \*  \* \*  \* \*  \* \*  \* \*

This matter is before the Court upon multiple Motions to Suppress filed by Defendant Richard R. Crawford (Docs. # 14, 18, and 28), and two Report and Recommendations ("R&Rs") prepared by Magistrate Judge Candace J. Smith. (Docs. # 21 and 37). In the R&Rs, Judge Smith recommends that Defendant's Motions to Suppress be denied. *Id.* The Defendant having filed Objections to both R&Rs (Docs. # 22 and 38), and the Government having responded to the Defendant's Objections (Docs. # 26 and 40), the Motions are ripe for the Court's review. For the reasons that follow, the Defendant's Objections are **overruled**, both R&Rs are **adopted**, and Defendant's Motions to Suppress (Docs. # 14, 18, and 28) are **denied**.

**I.        FACTUAL AND PROCEDURAL BACKGROUND**

In May 2017, the Northern Kentucky Drug Strike Force ("NKDSF") and the Hamilton County Sheriff's Department's Regional Narcotics Unit ("RENU") were investigating the distribution and trafficking of cocaine in the Greater Cincinnati area. With the assistance of a confidential informant ("CI"), the investigation turned toward Richard Crawford. (Doc. # 19-1 at 5).

On May 23, 2017, RENU Agent Erik Nelson was told by a CI that Crawford was an individual who was distributing cocaine in and around Hamilton County, Ohio. *Id.* During this encounter, the CI provided Crawford's phone number and positively identified Crawford, from a drivers' license photograph, as the person distributing cocaine and using the particular phone number. *Id.* At the time that Agent Nelson received this initial information, he knew the CI to be a "reliable and trustworthy" source. *Id.* In fact, the CI had previously worked as an informant for Agent Nelson's agency—RENU—and the information the CI provided led to the arrest of an individual distributing narcotics. *Id.* The CI had also worked as an informant for other law-enforcement agencies in the past, including the Drug Abuse Reduction Task Force and the Hamilton County Heroin Coalition Task Force. *Id.* Agent Nelson learned through members of those agencies that the CI's information had also led to the arrest and convictions of individuals distributing narcotics in their investigations. *Id.* In addition, those two agents "confirmed that the CI was reliable and trustworthy." *Id.*

Approximately four days later—on May 27, 2017—Agent Nelson and the CI communicated again. *Id.* In addition to verifying that Crawford continued to use the identified phone number, the CI also told Agent Nelson that Crawford had expressed his intention to distribute twenty ounces of cocaine. *Id.* Agent Nelson then conducted a records check with the Regional Crime Information Center ("RCIC") and discovered that Crawford had prior convictions for possessing drugs and trafficking in drugs. *Id.*

The following week, the CI and Agent Nelson spoke again. *Id.* After verifying that Crawford continued to use the particular phone number, the CI informed Agent Nelson that Crawford had traveled to Columbus, Ohio with the purpose of reconnecting with a

drug-distribution organization. *Id.* at 5-6. During this conversation, the CI relayed prices from his conversations with Crawford. *Id.* at 6. Specifically, the CI stated that Crawford had detailed his cost for a "brick" of cocaine and that Crawford had quoted the CI a price of $1,500 for an ounce of cocaine. *Id.* On June 4, 2017, Agent Nelson personally reviewed text-message conversations between the CI and Crawford, which verified the identified phone number. *Id.*

Based on the above information, Agent Nelson applied for a search warrant for Crawford's cell phone. *Id.* at 1. Agent Nelson attached an affidavit to his warrant application that described the foregoing facts. *Id.* at 4-7. On June 5, 2017, the Hamilton County Court of Common Pleas issued a search warrant authorizing the "electronic monitoring and tracking information" for Crawford's Sprint cell phone ("the cell phone warrant"). *Id.* at 2.

The following day—June 6, 2017—the CI informed Agent Nelson that Crawford was driving a silver BMW X5, bearing the Ohio registration of ENQ 9175. (Doc. # 19-2 at 3). Agent Nelson verified that information through a records check with RCIC and confirmed that the identified vehicle was registered to Crawford, with an address of 11408 Raphael Place, Cincinnati, Ohio 45240. *Id.*

Using RENU investigative techniques, Agent Nelson learned that Crawford was in the area of 661 Mission Lane, Florence, Kentucky. *Id.* And on the morning of June 9, 2017, Agent Nelson conducted surveillance of Crawford at that address. *Id.* In addition to spotting the silver BMW X5 in the parking lot, Agent Nelson also observed Crawford exit the front door of 661 Mission Lane and enter the driver-side door of the silver BMW X5 and depart the apartment complex. *Id.* That same day, Agent Nelson conducted a

records check through Autotrack and found that Crawford had a reported address of 661 Mission Lane, Unit # 608, Florence, Kentucky 41042. *Id.*

Based on that information, as well as the information previously relied on to seek the cell phone warrant, Agent Nelson applied for a search warrant authorizing the installation and monitoring of a GPS device on Crawford's vehicle for a period of thirty days. *Id.* at 5. The Hamilton County Municipal Court issued that warrant ("the Ohio GPS warrant") on June 12, 2017. *Id.*

On June 21, 2017, a similar search warrant for the same vehicle was obtained from the Boone County Circuit Court in Kentucky. (Doc. # 19-3). That warrant ("the Kentucky GPS warrant") also authorized the installation and monitoring of a GPS device on Crawford's vehicle, but for a period of sixty days. *Id.* at 1. In support of that warrant, NKDSF Agent Chris Boyd prepared an affidavit. *Id.* at 5-7. In addition to outlining his training and experience, Agent Boyd's affidavit reiterated the exact same information that supported the two prior Ohio warrants. *Id.* In addition, Agent Boyd included information gained on June 13, 2017, the day after the Ohio GPS warrant was issued. *Id.* at 7. Specifically, Agent Boyd's affidavit relayed that the CI had informed agents that Crawford had told the CI that "he had 18 ounces of cocaine left" and "offered to sell the CI ounces" at $1,400 an ounce. *Id.*

On June 27, 2017, Agent Nelson, Agent Boyd, and other NKDSF agents met with the CI. (Doc. # 19-4 at 4). During that meeting, the CI told the agents that Crawford had recently made numerous attempts to sell the CI "large quantities of cocaine." *Id.* At the direction of Agent Nelson and Agent Boyd, the CI "made a consensually monitored and

recorded call" to Crawford, using the previously identified phone number, and set up a controlled buy. *Id.*

With the controlled buy scheduled, agents "conduct[ed] pre-surveillance" in the area of 661 Mission Lane, Unit # 608, Florence, Kentucky, where Crawford resided. *Id.* at 5. "Agents observed Crawford exit his apartment building with a small black duffel bag in his hand," which corroborated the CI's prior statement that Crawford usually kept "his cocaine inside the black duffel," and entered the silver BMW X5. *Id.* Agents then followed Crawford to "430 Meijer Drive, the agreed upon place to meet and conduct the transaction." *Id.*

Prior to the controlled buy, NKDSF agents searched the CI and his/her vehicle and confirmed that the CI did not have any contraband or currency. *Id.* "Agents then provided the CI with recorded NKDSF funds and equipped him/her with an audio recording/transmitting device." *Id.* Agents followed the CI to the agreed-upon location and maintained "constant observation until he/she entered the location." *Id.* "Within a few minutes, the CI exited the building" and "left the location followed by agents." *Id.* Agent Boyd then met the CI, and he/she "immediately turned over a quantity of cocaine." *Id.* Thereafter, the CI was searched again for contraband and currency and none were found. *Id.*

After the controlled buy, the CI provided details about his exchange with Crawford. *Id.* Specifically, the CI told agents that "he/she purchased the cocaine from Richard Crawford inside 430 Meijer Drive in exchange for the provided funds." *Id.* The CI also informed agents that Crawford "attempted to provide additional cocaine on consignment." *Id.* Agent Boyd then confirmed multiple facts. First, Agent Boyd conducted a test on the

substance the CI had purchased and it "tested positively for cocaine." *Id.* Then, Agent Boyd "reviewed the GPS log" and discovered that Crawford "left his residence" at approximately 1:52 p.m. and "arrived at Meijer Drive" at approximately 2:00 p.m. *Id.* "Further review of the GPS data showed after the controlled purchase was complete" Crawford left the parking lot of 430 Meijer Drive at approximately 3:19 p.m. and returned back to his residence at 661 Mission Lane at approximately 4:12 p.m. *Id.* Agent Boyd also made contact with an employee at the "Trellises Apartment complex" and confirmed that Amber Crawford was "the person on the lease for 661 Mission Lane Unit # 608" and that "Amber's husband [was] Richard Crawford." *Id.*

Based on all of the aforementioned information, Agent Boyd applied for a search warrant for the premises located at 661 Mission Lane Unit # 608, Florence, Kentucky, as well as the silver BMW X5. *Id.* at 6. A Boone County Circuit Court Judge issued that search warrant ("the apartment and vehicle warrant") on June 29, 2017, and it was executed that same day. *Id.* at 8-9. Agents made initial contact with Crawford outside his residence. (Doc. # 36 at 8-9). Specifically, Sergeant Wilson, an officer with the Kentucky State Police, observed Crawford "come down the stairs from the subject apartment and walk towards his vehicle." *Id.* At that time, Sergeant Wilson approached Crawford, identified himself as a law-enforcement officer, and escorted Crawford to a Boone County Sheriff's cruiser. *Id.* at 9, 51-52. With the assistance of two other officers— Agent Roland and Agent Piper—Crawford was handcuffed and his pockets were emptied. *Id.* at 13-14, 52. Inside his pockets, officers found keys, which were used to execute the search. *Id.* at 31-32, 52.

As Sergeant Wilson placed Crawford in the cruiser, he removed a card from his badge case and read Crawford his *Miranda* rights. *Id.* at 9-10. Agent Nelson and Agent Boyd, who had been conducting surveillance of Crawford from an unmarked vehicle, observed Crawford being taken into custody. *Id.* at 18, 31. Agent Nelson and Agent Boyd then approached Crawford when he was handcuffed and in the cruiser and began to speak with him. *Id.* at 32-35, 44. First, the agents explained that they were there with a search warrant to locate cocaine. *Id.* At that time, Agent Boyd pulled out his cell phone, accessed an application on his phone, and relied on that application to read Crawford his *Miranda* rights. *Id.* at 32-33.

After questioning began, Boone County Deputy Canfield opened the cruiser's door, positioned a body camera in the cruiser, and began recording the interrogation. *Id.* at 23-24, 30, 34-37. As the recording begins, Crawford can be heard responding to the agents' questions and telling them about the old cocaine he had found in storage and placed under the sink. (Doc. # 35, Joint Ex. 1 at 13:55:25). Following the interrogation, Agent Nelson and Agent Boyd went upstairs and assisted with the execution of the search of the apartment. (Doc. # 36 at 22-23). Crawford was left in the custody of Boone County Deputy Canfield. During his time with Deputy Canfield, Crawford posed several questions to him regarding probable cause. (Doc. # 35, Joint Ex. 1 at 14:00:00-14:20:46). The exact wording of Deputy Canfield's responses changed, but the message was consistent—he denied any specific knowledge of Crawford's case and avoided asking Crawford any questions about the alleged criminal activity. *Id.* Deputy Canfield also explained to Crawford why he adopted such an approach—he was unaware if Crawford had received his *Miranda* warnings and did not want to violate Crawford's rights. *Id.*

On September 14, 2017, a federal grand jury returned an Indictment against Crawford, charging him with the following three counts: (1) knowingly and intentionally distributing a mixture or substance containing cocaine, (2) knowingly and intentionally possessing a mixture or substance containing cocaine with the intent to distribute it, and (3) knowingly and intentionally possessing twenty-eight grams or more of a mixture or substance containing cocaine base (crack cocaine) with the intent to distribute it, all in violation of 21 U.S.C. § 841(a)(1).  (Doc. # 1).  The Defendant was arrested four days later, on September 20, 2017.  (Doc. # 8).

The Defendant filed a Motion to Suppress on November 9, 2017 (Doc. # 14) and a Supplemental Motion to Suppress on November 28, 2017.  (Doc. # 18).  In those Motions, the Defendant claimed that each of the warrants issued were not supported by probable cause, and sought the suppression of all evidence obtained as a result of those warrants, as well as any "fruit of the poisonous tree."  (Docs. # 14 and 18).  After the United States filed its Response (Doc. # 19) and Defendant filed his Reply (Doc. # 20), Judge Smith issued an R&R, recommending that Defendant's Motions to Suppress be denied.  (Doc. # 21).

During the time period for objections to the first R&R, the Defendant sought leave to file another Motion to Suppress, which Judge Smith granted.  (Docs. # 24 and 27).  On March 22, 2018, the Defendant filed the additional Motion to Suppress, arguing that the incriminating statements he made to law-enforcement officers during the June 29, 2017 execution of the search warrant should be suppressed because he did not receive *Miranda* warnings.  (Doc. # 28).  After briefing on that Motion concluded (Docs. # 29 and 31), Judge Smith held an evidentiary hearing on April 19, 2018.  (Doc. # 34).  On May 18,

2018, Judge Smith issued her second R&R, recommending that the Court deny that Motion to Suppress as well. (Doc. # 37).

Both R&Rs having been objected to (Docs. # 22 and 38), and the United States having responded to both Objections (Docs. # 26 and 40), the Motions to Suppress (Docs. # 14, 18, and 28) and the R&Rs (Docs. # 21 and 37) are ripe for the Court's review.

## II. ANALYSIS

### A. Standard of Review

Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59, a district court may refer a motion to suppress to a magistrate judge for the preparation of a report and recommendation. "The magistrate judge must promptly conduct the required proceedings and enter on the record a recommendation for disposing of the matter, including any proposed finding of fact." Fed. R. Crim. P. 59(b)(1). If a party files timely objections to the recommendation, the district court must consider those objections *de novo* and "accept, reject, or modify the recommendation." Fed. R. Crim. P. 59(b)(3). Failure to object to a Magistrate Judge's findings or conclusions results in waiver of those objections. Fed. R. Crim. P. 59(b)(2).

Moreover, the objections must be specific. "[V]ague, general or conclusory objections" are "tantamount to a complete failure to object." *Cole v. Yukins*, 7 F. App'x 354, 356 (6th Cir. 2001) (citing *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995)). Therefore, "an 'objection' that does nothing more than state a disagreement with a magistrate judge's suggested resolution, or simply summarizes what has been presented before, is not an 'objection' as that term is used in this context." *United States v. Vanover*, No. 2:10-cr-14-DLB, 2017 WL 1356328, *1 (E.D. Ky. Apr. 11, 2017) (quoting *VanDiver v.*

*Martin*, 304 F. Supp. 3d 934, 938 (E.D. Mich. 2004)).

The Defendant has raised multiple objections to the Magistrate Judge's R&Rs.[1] (Docs. # 22 and 58). With respect to the first R&R, the Defendant has advanced three arguments. First, the Defendant claims that the CI was not sufficiently reliable. (Doc. # 22 at 1-2). Second, the Defendant argues that the agents "did little" to corroborate the CI's information. *Id.* at 3. And third, the Defendant claims that the *Leon* good-faith exception does not apply and thus, exclusion of the evidence is warranted. *Id.* at 4. For his Objections to the second R&R, the Defendant argues that Judge Smith "misse[d] the mark" for two reasons. (Doc. # 38 at 1). First, the Defendant claims that the R&R fails "to recognize the confusion caused by the agents and the officers at the scene of the execution of the search." *Id.* And second, the Defendant argues that Judge Smith took "a statement of the Defendant out of context." *Id.* Each of the Defendant's Objections will be addressed in turn.

## B.    Each of the search warrants were supported by probable cause.

"The Fourth Amendment, which applies to the states through incorporation by the Fourteenth Amendment, protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 358 (6th Cir. 2013) (citing U.S. Const. amend. IV). To protect those rights, the Fourth Amendment further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing

---

[1]    In his Objections, the Defendant attempts to lodge a general objection to the entirety of both R&Rs. (Docs. # 22 at 1; 38 at 1) (stating that the Defendant "incorporates by reference, as if fully set out herein," the arguments made in his prior briefing and at the evidentiary hearing). Such "objections," however, are vague, merely state a disagreement with the R&Rs, and thus, amount to no objection at all.

the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Supreme Court has interpreted the Fourth Amendment to require "only three things" with respect to search warrants. *Dalia v. United States*, 441 U.S. 238, 255 (1979). "First, warrants must be issued by neutral, disinterested magistrates." *Id.* "Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that 'the evidence sought will aid in a particular apprehension of conviction' for a particular offense." *Id.* (quoting *Warden v. Hayden*, 387 U.S. 294, 307 (1967)). And third, "warrants must particularly describe the things to be seized, as well as the place to be searched." *Id.*

In this case, the Defendant has not argued that the warrants were not issued by a neutral magistrate. Nor has he argued that the warrants did not particularly describe the places to be searched or the items to be seized. Therefore, the sole issue is whether the search warrants were supported by probable cause.

The Sixth Circuit has instructed courts "to refrain from reviewing a search warrant affidavit in a 'hypertechnical' manner or engaging in 'line-by-line scrutiny.'" *United States v. Bethal*, 245 F. App'x 460, 465 (6th Cir. 2007). "Instead, courts are to consider 'whether the totality of the circumstances supports a finding of probable cause.'" *Id.* (quoting *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004)). "The issuing judge's determination as to probable cause is to be afforded 'great deference' and should be overturned 'only if he arbitrarily exercised his discretion.'" *Id.* (quoting *Woosley*, 361 F.3d at 926). In turn, the "issuing judge or magistrate may give considerable weight to the conclusion of experienced law enforcement officers regarding where evidence of a crime is likely to be found and is entitled to draw reasonable inferences about where evidence is likely to be

kept, based on the nature of the evidence and the type of offense." *Id.* (citing *United States v. Caicedo*, 85 F.3d 1184, 1192 (6th Cir. 1996)). "[I]n seeking suppression of evidence, the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003)).

To comply with the Fourth Amendment's probable-cause requirement, an affidavit submitted in support of a search warrant must include sufficient information to allow the court to find probable cause to justify the search and seizure. *Illinois v. Gates*, 462 U.S. 213, 239 (1983). Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion. *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006). "In determining whether there is probable cause to issue a search warrant, the task of the issuing magistrate is 'simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005). The issuing magistrate must make the probable-cause determination based only on the information contained within the four corners of the affidavit. *United States v. Frazier*, 423 F.3d 526, 535 (6th Cir. 2005). The affidavits at issue here easily satisfy that standard.

The first warrant issued—the cell phone warrant—was based largely upon Agent Nelson's statements about his interaction with the CI. (Doc. # 19-1). The second and third warrants issued—the Ohio GPS warrant and the Kentucky GPS warrant—were supported by substantially similar descriptions of Agent Nelson's interactions with the CI, in addition to new evidence that had been acquired since the cell phone warrant was

issued.  (Docs. # 19-2 and 19-3).  Specifically, when requesting the Ohio GPS warrant, Agent Nelson also included information regarding his verification of the Defendant's vehicle registration with RCIC, the observations he made while conducting surveillance of the Defendant at his apartment, and the verification of Defendant's address with Autotrack.  (Doc. # 19-2 at 3).  Agent Boyd also included this information in his affidavit requesting the Kentucky GPS warrant, as well additional evidence regarding a recent conversation that had transpired between the CI and Crawford.  (Doc. # 19-3 at 7).  The fourth and final warrant issued—the apartment and vehicle warrant—included all of the aforementioned information, and added a detailed account of the controlled buy that occurred between the CI and the Defendant.  (Doc. # 19-4 at 4-7).  The R&R concluded that each of these warrants were supported by probable cause.  (Doc. # 21 at 8-10).

### 1.    Reliability and Corroboration

Without specifying a particular warrant, the Defendant's Objections take issue with the R&R's conclusion regarding probable cause.  (Doc. # 22).  The Defendant's first and second arguments are focused on the CI.  *Id.*  Specifically, the Defendant claims that the CI was not sufficiently reliable and that the agents "did little" to corroborate the CI's information.  *Id.* 1-3.

As the R&R thoroughly and thoughtfully explained, the information officers obtained from the CI was sufficient to establish probable cause for each of the warrants.  (Doc. # 21 at 7-11).  In determining whether the police had probable cause, courts apply a totality-of-the-circumstances test.  *Gates*, 462 U.S. at 230.  When probable cause is based on an informant's tip, "[a]t least three circumstances potentially bear on" the probable-cause determination: "(1) the reliability of the informant; (2) the basis of the

informant's knowledge; and (3) any police corroboration of the informant's tip." *United States v. Tillman*, 404 F. App'x 949, 951 (6th Cir. 2010) (citing *Gates*, 462 U.S. at 238-42). In this case, each of those considerations support a finding of probable cause.

First, the CI was reliable. The "information contained in the affidavit supporting the search warrant was not that of an 'uncorroborated tip of an unknown informant.'"[2] *United States v. Couch*, 367 F.3d 557, 560 (6th Cir. 2004) (quoting *United States v. Perkins*, 994 F.2d 1184, 1188 (6th Cir. 1993)). Rather, the CI in this case had a "reliable track record vouched for by law enforcement officials." *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001) (citing *Florida v. J.L.*, 529 U.S. 266, 270 (2000)). Although the Defendant argues that it was "simply not enough for the Court to rely upon past performance of the" CI (Doc. # 22 at 1-2), "Sixth Circuit precedent clearly establishes that the affiant need only specify that the confidential informant has given accurate information in the past to qualify as reliable." *Greene*, 250 F.3d at 480 (citing *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000)).

Both Agent Nelson and Agent Boyd "averred that the confidential information ha[d] assisted … law enforcement officials in the past and this information had resulted in" arrests and convictions. *Id.* (Docs. # 19-1 at 5; 19-2 at 2; 19-3 at 6; 19-4 at 3). In fact, Agent Nelson also reached out to two law-enforcement officers with other agencies that the CI had worked for and further "confirmed that the CI was reliable and trustworthy" and

---

[2] Although the affidavits did not identify the CI's name, the Sixth Circuit has held that there is no "rigid requirement that a confidential informant always be named to the magistrate." *United States v. Jackson*, 470 F.3d 299, 308 (6th Cir. 2006) (citing *Woosley*, 361 F.3d at 927 n.4). Instead, the focus is on whether the informant is "personally known to the [officer] who swore the affidavit" and whether the officer "attests with some detail" to the informant's reliability. *United States v. Allen*, 211 F.3d 970, 976 (6th Cir. 2000); *see also United States v. Crumpton*, 824 F.3d 593, 616 (6th Cir. 2016).

that the CI's information had led to the arrest and convictions of individuals distributing narcotics in their investigations as well. (Doc. # 19-1 at 5). The "track record of the CI … weighs significantly in favor of the affidavit's reliability" because "an informant's record in providing information that ultimately led to arrests and/or convictions is highly instructive in assessing his reliability." *United States v. McIntosh*, 109 F. App'x 65, 69 (6th Cir. 2004) (citing *McCray v. Illinois*, 386 U.S. 300, 302-03 (1967); *United States v. Seta*, 669 F.2d 400, 403 (6th Cir. 1982)). Therefore, the reliability of the CI lent his/her information considerable weight in the totality-of-the-circumstances analysis.

Second, the "basis of knowledge" factor, which "refers to the particular means by which an informant obtained his information," also supports the issuing magistrates' probable-cause determination. *United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999). When considering an informant's basis of knowledge, courts must determine whether there is "sufficient indication from the underlying circumstances from which an informant could reasonably conclude illegal activity is afoot." *Id*. Here, the CI's basis of knowledge came firsthand, from his/her communications with Crawford. Indeed, the CI claimed that Crawford disclosed his cocaine-distribution activities to Crawford, informed the CI of his "cost" for a "brick" of cocaine, and quoted the price for prospective purchasers—$1,500 per ounce of cocaine. (Doc. # 19-1 at 6). The CI's "explicit and detailed description of the alleged wrongdoing" further bolstered his/her information and permitted the issuing magistrates to "reasonably infer that the informant had gained [the] information in a reliable way." *Id*.

The third factor—corroboration—also supports the issuing magistrates' probable-cause determination. Where an informant's reliability and basis of knowledge have been

thoroughly established, corroboration of the informant's information "is not a necessity." *Allen*, 211 F.3d at 976 (holding that where confidential informant is "personally known to the detective who swore the affidavit" and where the "information alleged was of direct personal observation of criminal activity," further corroboration by the police is unnecessary). "What an informant and [his/her] tip lack in intrinsic indicia of credibility, however, police must make up for in corroboration." *United States v. Howard*, 632 F. App'x 795, 804 (6th Cir. 2015) (citing *Woosley*, 361 F.3d at 927) ("an affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information")).

Here, in addition to the sufficient indicia of reliability discussed above, the law-enforcement officers corroborated the CI's information. Agent Nelson verified Crawford's phone number, ensured that the CI could identify Crawford from a drivers' license photograph, and discovered that Crawford had prior convictions for drug offenses. (Doc. # 19-1 at 5-6). Additionally, Agent Nelson reviewed text-message conversations between the CI and Crawford and detailed each of those verifications in the affidavit supporting the cell phone warrant. *Id.* Throughout the investigation, the law-enforcement officers' corroborative efforts continued. Prior to obtaining the Ohio GPS warrant and the Kentucky GPS warrant, the agents verified vehicle-registration information that the CI provided, began conducting surveillance of Crawford near 661 Mission Lane, Florence, Kentucky, and confirmed that Crawford had reported that address as his residence. (Docs. # 19-2 at 3; 19-3 at 7). The apartment and vehicle warrant was supported by additional corroborative evidence—namely, a controlled buy between the CI and

Crawford—that was directed and monitored by the law-enforcement officers. (Doc. # 19-4 at 4-5). Therefore, the CI in this case "was known, [he/she] explained the basis of her information," and at least some of the information he/she "gave was independently corroborated by the police." *Perkins*, 994 F.2d at 1188.

Despite the R&R's correct conclusion that probable cause supported each of the warrants, the Defendant's Objections attempt to attack the existence of probable cause through speculation and supposition. Specifically, the Defendant suggests that the CI had the "opportunity" to "set up" the Defendant and that the calls between the CI and Crawford could have been for some innocuous purpose, given that the CI and Crawford "worked out together … at the same gym." (Doc. # 22 at 2-3). Such hypotheticals, however, do not cast doubt on the existence of probable cause. Because "the police here did not witness any actual illegality … it is possible to imagine innocent explanations for the similarities between the informant's prediction of events and the events as they actually occurred." *United States v. Strickland*, 144 F.3d 412, 417 (6th Cir. 1998). But, "[t]o find probable cause, the law does not require that [courts] rule out every conceivable explanation other than a suspect's illegal conduct." *Id.* at 416. Although perhaps conceivable, the Defendant's hypothetical and innocuous explanations have no meaningful impact the probable-cause determination.

The Defendant also claims that the law-enforcement officers could have done more to corroborate and ensure the reliability of the controlled buy. (Doc. # 22 at 2) ("There is no indication that the agents checked" the CI's "locker prior to the alleged 'controlled buy.'"). And similarly, the Defendant appears to take issue with the inaudible controlled-buy recording. *Id.* These complaints, however, do not warrant suppression of

the evidence. While law-enforcement officers can always do more to investigate and corroborate, their shortcomings only become constitutional violations when probable cause is lacking. Therefore, neither the Defendant's arguments regarding the investigation's alleged inadequacies nor his suspicions regarding the inaudible nature of the controlled-buy recording cast doubt on the existence of probable cause.

The last of the Defendant's probable-cause arguments is premised on important information that the affidavits supposedly lacked. (Doc. # 22 at 2). In particular, the Defendant claims that the affidavits did not include the CI's "criminal history" and did not disclose whether the CI's information was "motivated by a particularly favorable plea or cooperation deal." *Id.* Such arguments, however, are flawed. Even if "additional details about the confidential informant may have been helpful, '[t]he affidavit is judged on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added.'" *Woosley*, 361 F.3d at 927 (quoting *Allen*, 211 F.3d at 975).

Although "[i]ndicia of an informant's credibility are certainly important in an affidavit," and the "omission of known information regarding credibility can in some cases be misleading enough to be deemed a falsehood under *Franks*," that is certainly not the case here. *United States v. Jones*, 533 F. App'x 562, 568 (6th Cir. 2013). When a defendant challenges "the sufficiency of an executed search warrant by attacking the veracity of the affidavit supporting the warrant," the defendant may be entitled to an evidentiary hearing. *United States v. Fowler*, 535 F.3d 408, 415 (6th Cir. 2008) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)). "In the case of alleged material omissions … the defendant is entitled to a hearing if and only if: (1) the defendant makes a substantial preliminary showing that the affiant engaged in deliberate falsehood or reckless disregard

for the truth in omitting information from the affidavit, and (2) a finding of probable cause would not be supported by the affidavit if the omitted material were considered to be a part of it." *Id.* (citing *United States v. Atkin*, 107 F.3d 1213, 1216-17 (6th Cir. 1997)).

The Sixth Circuit has purposefully established "a higher bar for obtaining a *Franks* hearing on the basis of an allegedly material omission as opposed to an allegedly false affirmative statement" to restrict "'the potential for endless rounds of *Franks* hearings' due to potentially 'endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit.'" *Id.* at 415-16 (quoting *United States v. Martin*, 920 F.2d 393, 398 (6th Cir. 1990)).

Here, as in *Fowler*, the only alleged omissions relate to the CI's criminal history and potential motivations, and such omissions "would not satisfy the second requirement for a *Franks* hearing because the additional information would have had no impact on the finding of probable cause":

> The fact that the confidential informant was engaged in criminal activities might make the confidential informant less credible than a member of the general population, but that is hardly a reason to doubt the reliability of the information given to the affiant, especially given the numerous indications of reliability provided in the affidavit. Considering that "it is often people involved in criminal activities themselves that have the most knowledge about other criminal activities," … it is no surprise that most confidential informants are engaged in some sort of criminal activity. It would unduly hamper law enforcement if information from such persons were considered to be incredible simply because of their criminal status. Without more than a mere allegation that the affiant failed to disclose the nature and degree of the confidential informant's criminal activity, [the Defendant is] not entitled to a *Franks* hearing.

*Id.* at 416 (quoting *Martin*, 920 F.3d at 398-99).

Therefore, the R&R correctly determined that the Defendant was not entitled to a *Franks* hearing because he failed to make "a substantial preliminary showing that the

affiant engaged in deliberate falsehood or reckless disregard for the truth" and failed to establish that "probable cause would not be supported by the affidavit if the omitted material" regarding the CI's criminal history "were considered to be a part of it." *Id.* at 415 (citing *Atkin*, 107 F.3d at 1216-17). Examining the evidence in this case within the totality of the circumstances, and according deference to the conclusion of the issuing magistrates, probable cause existed to support the issuance of each search warrant. Accordingly, the Defendant's Objections to the R&R's probable-cause conclusions are **overruled**.

### 2. Leon's Good-Faith Exception

The Defendant's third argument is premised on the warrants' lack of probable cause. Specifically, the Defendant claims that the *Leon* good-faith exception does not apply and thus, exclusion of the evidence is warranted. (Doc. # 22 at 4). Having found that the warrants were supported by probable cause, Defendant's third objection is also without merit and is **overruled**.

That said, even if the warrants were deemed defective, the searches were valid under the good-faith exception to the warrant requirement. Under *United States v. Leon*, 468 U.S. 897 (1984), the exclusionary rule, which suppresses illegally obtained evidence, does not apply where "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Id.* at 920. Although there are four situations where the *Leon* good-faith exception is inapplicable, none of those situations are presented here.

First, none of the affidavits contained information that Agent Nelson or Agent Boyd knew or should have known was false. Second, the affidavits contained enough

information that the issuing magistrate could make a determination to issue it, without becoming a "rubber stamp" for police activities. *Id.* at 914. Third, the affidavits were not so conclusory as to constitute "bare bones" affidavits. *Id.* at 915. And fourth and finally, the warrants were not so facially deficient that they could not be presumed valid. *Id.* at 923. Therefore, even if the warrants did not meet the threshold of probable cause, they certainly satisfy the "less demanding showing" required under *Leon*'s good-faith exception. *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004) (en banc).

## C.    Suppression of the Defendant's statements is unwarranted.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To protect that privilege, law-enforcement officers are required to inform a person of his right to remain silent before subjecting him to a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966). "In practice, this places a burden upon state and federal officers to ensure that a suspect in custody is 'adequately and effectively apprised of his rights' and to honor those rights when exercised unless they have been waived." *United States v. Saylor*, 705 F. App'x 369, 372 (6th Cir. 2017). Specifically, *Miranda* mandates the following "procedural safeguards":

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.

*Miranda*, 384 U.S.at 444. The defendant, however, "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." *Id.* Because the "warning of rights and their subsequent waiver are both 'prerequisites to the admissibility of any statement made by the defendant,' the failure of law-enforcement

officers to adequately warn a suspect in custody of his constitutional rights is fatal to the admission of any testimony induced by subsequent police interrogation." *Saylor*, 705 F. App'x at 372 (quoting *Miranda*, 384 U.S. at 476).

Here, neither party contests that the Defendant was subjected to a custodial interrogation within the meaning of *Miranda*. Rather, the parties' dispute focused on whether the Defendant was informed of his *Miranda* rights before he made the incriminating statements. In his Objections, however, the Defendant fails to directly object to Judge Smith's credibility determination and instead "assum[es] *arguendo*" that the law-enforcement officers testified truthfully and accurately and attempts to mount other attacks against the R&R. (Doc. # 38 at 1). In the remainder of his Objections, the Defendant argues that the R&R "misse[d] the mark by failing to recognize the confusion caused by the agents and officers at the scene of the execution of the search warrant" and erred "by taking a statement of the Defendant out of context." *Id.* at 1-2. Each of the Defendant's arguments will be addressed in turn.

### 1. Miranda Warnings and the Credibility Determination

A district court reviews the objected-to portions of a R&R *de novo*. *See United States v. Raddatz*, 447 U.S. 667, 681-81 (1980). When an objection challenges the Magistrate Judge's credibility determination, the district court has discretion to decide whether to rehear the evidence presented at the suppression hearing. *Id.* at 680-81. Despite the Defendant's failure to directly object to the credibility determination, the Objections appear to take issue with the R&R's conclusion regarding credibility. Therefore, out of an abundance of caution, the Court will review that portion of the R&R as well.

The Magistrate Judge, as the fact-finder who sees and hears the witnesses, is uniquely situated to assess the credibility of witnesses. Thus, this Court must "accord[ ] great deference to such credibility determinations." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). In this case, a review of the R&R reveals that such deference is warranted and that a rehearing is unnecessary.

At the evidentiary hearing, the Defendant first testified that he did not "recall" anyone reading him his *Miranda* rights. (Doc. # 36 at 54). Later, however, the Defendant testified with more certainty, and when asked whether he simply did not remember receiving his *Miranda* warnings or whether he did not receive them, the Defendant responded "It did not happen." *Id.* at 61. Three law-enforcement officers, on the other hand, testified that the Defendant did receive his *Miranda* warnings. *Id.* at 9-10, 13-14, 19-20, 32-34.

Faced with this conflicting testimony, Judge Smith determined that Agent Boyd, Agent Nelson, and Sergeant Wilson were more credible than the Defendant for three reasons. (Doc. # 37 at 12-13). First, Judge Smith noted that the law-enforcement officers testified consistently and persuasively. *Id.* at 12. Second, Judge Smith found that the Defendant's testimony did "not comport with the record and fail[ed] to mitigate the Government's showing by a preponderance of the evidence." *Id.* And third, Judge Smith concluded that any confusion that resulted from the Defendant's discussions with Deputy Canfield, and caused by Deputy Canfield's lack of familiarity with the investigation and situation, "did not undercut" the other law-enforcement officers' "full recitation of the *Miranda* warnings" the Defendant received. *Id.* at 13. Therefore, Judge Smith carefully considered the witnesses' credibility and reasonably chose to accept the law-enforcement

officers' version of events over the Defendant's. Because "[c]redibility determinations of the magistrate judge who personally listened to the testimony of a witness should be accepted unless … [the district court] finds a reason to question the magistrate judge's assessment," this Court gives Judge Smith's credibility assessment great weight. *United States v. Johnson*, No. 10-cr-20176, 2011 WL 3844194, at *2 (W.D. Tenn. Aug. 30, 2011). Put simply, Judge Smith based her credibility determination on sufficient evidence in the record, and the Defendant has presented no reason for this Court to second-guess that assessment. *See United States v. Gray*, 182 F. App'x 408, 411 (6th Cir. 2006); *Peevler v. United States*, 269 F.3d 693, 702 (6th Cir. 2001).

### 2. Confusion on the part of the Defendant

In his Objections, the Defendant makes much of the fact that he was "confused and uncertain about whether he was under arrest, not under arrest, being detained, not being detained, etc." (Doc. # 38 at 2). That confusion, the Defendant claims, made it "improper" for the law-enforcement officers to interrogate the Defendant and illicit incriminating statements. *Id.* The Defendant's argument, however, is easily rejected for two reasons. First, the Court has found that the Defendant was indeed subjected to a custodial interrogation for purposes of *Miranda*. (Doc. # 37 at 10-11). Thus, the Defendant's confusion about his custodial status is entirely irrelevant. Instead, the important inquiry is whether the Defendant was informed of his *Miranda* rights and voluntarily, knowingly, and intelligently waived those rights. The R&R correctly answered both of those inquiries in the affirmative.[3] Second, any confusion that arose from the

---

[3] The Defendant's Objections do not challenge the R&R's conclusion that his waiver was not voluntary, knowing, and intelligent, and thus, any such argument has been waived. (Doc. # 38).

Defendant's conversations with Deputy Canfield occurred *after* the Defendant was interrogated by Agent Nelson and Agent Boyd and had already made the incriminating statements. (Doc. # 35, Joint Ex. 1 at 13:59:24-14:00:00). Therefore, suppression of the evidence is not warranted, the Defendant's Objections are **overruled**, and the Defendant's Motions to Suppress (Docs. # 14, 18, and 28) are **denied**.

## III.   CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)   The Reports and Recommendations of the United States Magistrate Judge (Docs. # 21 and 37) are hereby **adopted** as the findings of fact and conclusions of law of the Court;

(2)   Defendant's Objections (Docs. # 22 and 38) are hereby **overruled** as set forth herein;

(3)   Defendant's Motions to Suppress (Docs. # 14, 18, and 28) are hereby **denied in full**;

(4)   The time period between the filing of Defendant's first Motion to Suppress on November 9, 2017 and this Order, with the exception of 8 days, totaling 237 days, is **excluded** from the provisions of the Speedy Trial Act pursuant to 18 U.S.C. 3161(h)(1)(D); and

(5)   This matter is scheduled for a **Status Conference** on **Thursday, July 19, 2018 at 8:30 a.m.** The parties shall be prepared to schedule the case for trial at that conference.

This 12th day of July, 2018.



Signed By:
*David L. Bunning*  DB
**United States District Judge**

K:\DATA\ORDERS\Covington Criminal\2017\17-34 Order Adopting R&R re Mtn to Suppress.docx